******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

STATE OF CONNECTICUT *v.*
QUAVON TORRES
(SC 20306)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.*

*Syllabus*

Convicted of the crimes of murder and carrying a pistol without a permit
in connection with the shooting death of the victim, the defendant
appealed to this court. The defendant, P, and L had been socializing with
M, the defendant's cousin, and the defendant's sister in an apartment.
L called the victim and asked him for a ride. The victim parked his car
outside of a pharmacy across the street from the apartment and went
inside of the pharmacy. The defendant, P, and L got into the victim's
car while the victim was inside the pharmacy. The victim returned to
his car and initially did not notice the defendant in the rear seat behind
the driver's seat. After the victim drove to a drive-through at a fast food
restaurant, the victim noticed that the defendant was in the car and told
him to get out. When the defendant refused, the victim got out and
walked around the car to the passenger's side in order to retrieve a
baseball bat. In response, the defendant exited the car, walked around
the rear of the car toward the passenger's side, and fatally shot the
victim. On appeal from the judgment of conviction, the Appellate Court
reversed the defendant's conviction and remanded the case for a new
trial. At the defendant's second trial, M testified, in an offer of proof
outside the presence of the jury, that, immediately before the defendant's
first trial, she encountered P in the courthouse, and P called M a "snitch"
and threatened her. M then testified that, two days later, P's sister and
two other individuals had assaulted her. The trial court denied the
state's motion in limine to preclude M's testimony with respect to the
courthouse encounter between P and M but granted the motion with
respect to the assault. At the defendant's second trial, M testified before
the jury that P ran by the apartment after the shooting and tossed L the
black revolver that allegedly was used to shoot the victim and that
was later found by the police. This testimony contradicted M's initial
statement to the police about whom she saw with the gun and her
testimony at the defendant's first trial. On direct appeal from the judg-
ment of conviction after the defendant's second trial, *held*:

1. The defendant could not prevail on his claim that the trial court improperly
   excluded evidence that M was assaulted before the defendant's first trial:
   a. The trial court's exclusion of evidence relating to the assault did not
   violate the defendant's sixth amendment rights to present a defense
   and to confrontation, as the court did not prevent the defendant from
   presenting evidence in furtherance of his third-party culpability claim
   or from challenging M's credibility; the defendant was permitted to pres-
   ent his version of the events to the jury and to elicit facts from which
   the jury could assess M's credibility, including her motive for testifying
   falsely at the defendant's first trial, as the jury heard M's testimony that
   P possessed the murder weapon on the day of the shooting, that M
   initially lied to the police because she was high and felt pressured, that
   she lied at the defendant's first trial because of P's threat, and that she
   was telling the truth at the defendant's second trial.
   b. Even if this court assumed, without deciding, the trial court improperly
   precluded testimony relating to the assault of M, the defendant failed
   to meet his burden of proving harm; the testimony of eyewitnesses to
   the shooting that implicated the defendant, which was corroborated by
   video surveillance footage and the statements of P and L to the police
   shortly after the murder, M's statement to the police implicating the
   defendant, which was made prior to P's threat and the subsequent assault
   of M, and certain forensics testimony, when considered together, made
   it unlikely that any error relating to the preclusion of testimony regarding
   the specifics of the assault would have changed the result of the defen-
   dant's trial.

   (*Three justices dissenting in one opinion*)

2. The defendant could not prevail on his claim that the trial court had violated his sixth amendment right to confrontation and the rules of evidence by preventing defense counsel from impeaching a state's witness, J, with evidence of J's prior criminal convictions; the trial court properly excluded evidence of J's misdemeanor larceny convictions as too remote, as the misconduct underlying those convictions was at least seventeen years old at the time of trial, and the court was permitted, but not required, to find that its remoteness outweighed its probative value.

Argued March 31, 2021—officially released May 10, 2022

*Procedural History*

Substitute information charging the defendant with the crimes of murder and carrying a pistol without a permit, brought to the Superior Court in the judicial district of New Haven, where the case was tried to the jury before *B. Fischer, J.*; thereafter, the court granted in part the state's motion to preclude certain evidence; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Jennifer B. Smith*, for the appellant (defendant).

*Laurie N. Feldman*, deputy assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, *Seth R. Garbarsky*, senior assistant state's attorney, and *Sean P. McGuinness*, assistant state's attorney, for the appellee (state).

*Opinion*

KAHN, J. The defendant, Quavon Torres, appeals from the judgment of the trial court convicting him of the crimes of murder in violation of General Statutes § 53a-54a (a) and carrying a pistol without a permit in violation of General Statutes § 29-35. The defendant's principal claim is that the trial court improperly excluded evidence of an assault of one of the state's witnesses, Tasia Milton. The defendant also claims that the trial court improperly prevented him from impeaching another state's witness, Teresa Jones, with evidence of certain previous criminal offenses. We disagree with both of these claims and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the evening of July 23, 2012, the defendant, Freddy Pickette, and Marcus Lloyd were socializing with the defendant's cousin, Milton, and the defendant's sister, Amber Torres, in a third floor apartment located at 543 Orchard Street in New Haven. At around 7 p.m. that evening, Lloyd called the victim, Donald Bradley, and asked him for a ride to a housing project in New Haven. Shortly thereafter, the victim parked his car outside of a CVS Pharmacy (CVS) located across the street from the apartment, got out of the driver's seat, and went inside of the store. Moments later, the defendant, Pickette, and Lloyd walked through the parking lot and got into the victim's car. Pickette sat in the front passenger seat, Lloyd sat in the rear passenger seat, and the defendant sat in the rear seat on the driver's side of the car.

A short time later, the victim exited the store and got back into the driver's seat, but he did not initially notice that the defendant was the person sitting behind him. Pickette then asked the victim to stop at a Burger King located a short distance to the east along Whalley Avenue. When they got to the drive-through, the victim noticed that the defendant was in the car and told him to get out. When the defendant refused, the victim got out of the driver's seat, walked around to the passenger side of the car, opened one of the doors, and leaned inside in order to retrieve a baseball bat from under a seat. In response, the defendant got out of the car, walked around the trunk toward the passenger side, and fatally shot the victim four times.

The defendant, Pickette, and Lloyd fled the scene of the shooting, heading back west along Whalley Avenue and then up Orchard Street toward the third floor apartment where they had previously been socializing. The defendant and Lloyd ran into the apartment, where they once again encountered Milton and Amber Torres. Pickette split off from the others, crossed Orchard Street, ran through the CVS parking lot, and eventually continued walking west along Whalley Avenue. Once inside of the apartment, the defendant gave Amber Torres a

black revolver with a wooden handle and told her "to do something with it . . . ." Amber Torres then picked up the revolver using a washcloth and placed it in a black bag.

The police arrived at the apartment soon thereafter, surrounded the building, and instructed everyone inside to vacate the premises. Eventually, the defendant and Lloyd exited the building and were arrested. During a search of the apartment, the police located a .38 caliber black revolver with a wooden handle in a black bag. Inside of the revolver were two live rounds and four empty chambers. Later, ballistics testing determined that the revolver was the gun used to shoot and kill the victim.

The defendant was subsequently charged with, and convicted of, the crimes of murder and carrying a pistol without a permit. On appeal, the Appellate Court reversed that conviction and remanded the case for a new trial. See *State* v. *Torres*, 175 Conn. App. 138, 154, 167 A.3d 365 (reversing defendant's conviction due to improper in-court identification), cert. denied, 327 Conn. 958, 172 A.3d 204 (2017), cert. denied, U.S. , 138 S. Ct. 1303, 200 L. Ed. 2d 474 (2018). The case was then presented to a jury for a second time, and the defendant was once again convicted of the crimes of murder and carrying a pistol without a permit. The trial court imposed a total effective sentence of fifty years of incarceration on those charges.[1] The defendant now appeals from that conviction directly to this court pursuant to General Statutes § 51-199 (b) (3).

I

The defendant's first claim is that the trial court improperly excluded evidence that Milton was physically assaulted in the days leading up to the defendant's first trial. Specifically, the defendant argues that evidence of this assault was necessary in order to explore Milton's motives, interests, and bias, and that the exclusion of that evidence violated the defendant's rights under the sixth amendment to the United States constitution. The defendant, in the alternative, also implicitly presses the underlying claim of evidentiary error. For the reasons that follow, we reject defendant's constitutional claims and conclude that any evidentiary error was harmless.

The following undisputed facts and procedural history are necessary to our consideration of these claims. Before trial in the present case, the state filed a motion in limine seeking to exclude "any and all evidence relating to an argument between . . . Pickette and . . . Milton on August 14, 2014, and an assault [on] . . . Milton on August 16, 2014 . . . ." In an accompanying memorandum of law, the state argued that evidence regarding the argument and the assault should be excluded as irrelevant, inadmissible hearsay, inadmissi-

ble character evidence, and as unduly prejudicial. Defense counsel responded that such evidence was "relevant and [would go] to motive, interest, [and] bias of . . . Milton to lie."

In response to the trial court's request for an offer of proof, Milton testified outside of the presence of the jury as follows. Just prior to the defendant's first trial, Milton allegedly encountered Pickette and another individual in the hallway of the courthouse. An argument ensued, during which Pickette called Milton a "snitch" and said "they were going to whip [her ass]" if she testified. Milton responded to Pickette by asking, "how am I a snitch when we both [are] in the same predicament?" The second individual then said to Pickette, "don't argue with this girl, you have a sister named Ash Black . . . ." Two days later, Pickette's sister, Ashley Black, and two other individuals "jumped" and "beat on" Milton in New Haven. During this assault, Milton's assailants allegedly told her that she "should mind [her own] business" and mentioned "something about [Pickette] . . . ."

Following the offer of proof, defense counsel argued that the threat and the assault were admissible to show Milton's "motive, interest, bias with respect to [her] testimony, what may or may not have been said in the past, and . . . also . . . to [show the] state of mind and the consciousness of guilt of . . . Pickette . . . ." The trial court denied the state's motion in limine with respect to the argument between Pickette and Milton in the courthouse but granted the motion with respect to the assault of Milton in New Haven. The trial court reasoned that, because Pickette was involved in the argument in the courthouse hallway but not the assault, the connection between Milton's trial testimony and the latter was "too speculative . . . ." Specifically, the trial court reasoned: "Milton just indicated that one of these individuals said to her, mind your own business, nothing that's attributed to this case; that could be mind your own business concerning a domestic [situation] with [a] boyfriend [or] girlfriend. [It is] [f]ar too speculative, so it's not relevant evidence for this jury to hear."

Before the jury in the defendant's second trial, Milton testified that Pickette ran by 543 Orchard Street after the shooting and tossed Lloyd the gun that was later found by the police in the apartment. This testimony contradicted not only Milton's initial statement to the police about whom she saw with the gun but also her subsequent testimony during the defendant's first trial. Specifically, during her statement to the police on the night of the shooting, Milton said that she had seen the defendant giving the gun to Amber Torres and that she did not see Pickette after the shooting. Notwithstanding her initial statement to the police, Milton testified during the defendant's first trial that she never saw the defendant holding the gun. Milton, however, continued

to maintain that she had not seen Pickette after the shooting. The state offered, and the trial court subsequently admitted, both Milton's statement to the police and her testimony from the first trial as prior inconsistent statements for substantive purposes pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

Milton explained that her statement to the police on the night of the shooting implicated the defendant, her own cousin, rather than Pickette, a person she had never known before, because she was high, nervous, and felt "pressured by the cops." Milton also explained that she had lied at the defendant's first trial because she was afraid of Pickette. Specifically, on direct examination by the prosecutor, Milton gave the following specific testimony about Pickette's threats and the events that followed:

"Q. . . . [Y]ou had an incident with [Pickette] the last time you testified?

"A. Yes.

"Q. And was that here in court?

"A. Yes.

"Q. Where did that happen?

"A. In the hallway.

"Q. In the hallway. And what happened? Tell the jury what happened there.

"A. We had an argument.

"Q. You and [Pickette]?

"A. Yes.

"Q. Tell us what happened.

"A. I don't remember what happened, I just know that me and him had an argument, it got ugly from there.

"Q. . . . [W]as it physical; did anyone hit anybody?

"A. Close enough.

"Q. Well, that's not the question, ma'am. Did anyone hit anybody else?

"A. No.

"Q. Okay. And you had said previously that you had been threatened?

"A. Yes.

"Q. . . . [T]ell the jury how you got threatened.

"A. He threatened me in the hallway, saying he was going to have someone come beat my ass.

"Q. Um-Hm.

"A. They didn't come. *They seen me on the street and*

*then that's when it happened.*" (Emphasis added.)

Notwithstanding the trial court's evidentiary ruling earlier that same day relating to the assault, neither the prosecutor nor defense counsel objected to this testimony.

## A

The defendant's primary contention in this appeal is that the trial court's exclusion of evidence related to the assault of Milton violated his sixth amendment rights to present a defense and to confront the witnesses against him. We disagree.

The following principles govern our review of the defendant's constitutional claims. "It is fundamental that the defendant's rights to confront the witnesses against him and to present a defense are guaranteed by the sixth amendment to the United States constitution . . . [which is] made applicable to state prosecutions through the due process clause of the fourteenth amendment." (Internal quotation marks omitted.) *State* v. *Holley*, 327 Conn. 576, 593, 175 A.3d 514 (2018). A criminal defendant's "right to present a defense is the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. . . . Therefore, exclusion of evidence offered by the defense may result in the denial of the defendant's right to present a defense." (Internal quotation marks omitted.) Id., 593–94.

"Although [t]he general rule is that restrictions on the scope of cross-examination are within the sound discretion of the trial [court] . . . this discretion comes into play only after the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment. . . . The constitutional standard is met when defense counsel is permitted to expose to the jury the facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. . . . Indeed, if testimony of a witness is to remain in the case as a basis for conviction, the defendant must be afforded a reasonable opportunity to reveal any infirmities that cast doubt on the reliability of that testimony." (Internal quotation marks omitted.) *State* v. *Leconte*, 320 Conn. 500, 511, 131 A.3d 1132 (2016).

"[W]hether a trial court's . . . restriction of a . . . [witness'] testimony in a criminal trial deprives a defendant of his [constitutional] right to present a defense is a question that must be resolved on a [case-by–case] basis. . . . The primary consideration in determining whether a trial court's ruling violated a defendant's right to present a defense is the centrality of the excluded evidence to the claim or claims raised by the defendant at trial." (Internal quotation marks omitted.) *State* v. *Andrews*, 313 Conn. 266, 276, 96 A.3d 1199 (2014). In order to determine whether a defendant's constitutional

right to cross-examination has been satisfied, "[w]e consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial." (Internal quotation marks omitted.) *State* v. *Leconte*, supra, 320 Conn. 512.

On the basis of our thorough review of the record before us, we conclude that the exclusion of the assault evidence did not infringe on either the defendant's right to present a defense or his right to confront Milton. The defendant was permitted to present his version of the events to the jury and to elicit the essential facts from which the jury could assess Milton's credibility, which is what the constitution requires under these circumstances. The defendant's third-party culpability defense was, indeed, central to his theory of the case, but the jury heard Milton's testimony that Pickette was the one with the black revolver that day. Milton also testified that she initially lied to the police because she was high and felt pressured, that she lied at the defendant's first trial because of Pickette's threats, and that she was, at the defendant's second trial, telling the truth.

Because defense counsel was permitted to cross-examine Milton about her motive for testifying falsely at the defendant's first trial and to elicit testimony implicating Pickette, the trial court's exclusion of evidence pertaining to the assault did not violate the defendant's sixth amendment rights. See, e.g., *State* v. *Jordan*, 329 Conn. 272, 287 n.14, 186 A.3d 1 (2018) (concluding that "[t]he constitutional right to present a defense does not include the right to introduce any and all evidence claimed to support it" and that no constitutional violation occurred when "the trial court's exclusion of evidence . . . did not prevent the defendant from presenting other evidence that supported his theory of [defense]"). As a result, defendant's constitutional claims must fail.

### B

We turn next to the underlying claim of evidentiary error. Assuming, without deciding, that the trial court improperly precluded additional testimony relating to the assault of Milton, we conclude that the defendant has failed to meet his burden of proving harm.[2] Specifically, we conclude that the accounts provided by witnesses to the shooting itself, video surveillance footage from various security cameras in the surrounding area corroborating those observations, and Milton's statement to the police implicating the defendant, which was made prior to Pickette's threats and the assault, considered together in the context of the record before us as a whole, make it unlikely that any error relating to the preclusion of further testimony about the assault of Milton would have changed the result of the defen-

dant's trial.

"[W]hether [an improper ruling] is harmless in a particular case depends [on] a number of factors, such as the importance of the witness' testimony in the [defendant's] case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the . . . evidence on the trier of fact and the result of the trial." (Internal quotation marks omitted.) *State* v. *Fernando V.*, 331 Conn. 201, 215, 202 A.3d 350 (2019). Because this inquiry is evidentiary in nature, rather than constitutional, the defendant bears the burden of proving that the trial court's exclusion of evidence substantially swayed the jury's verdict. Id. Specifically, in order to prevail, the defendant must establish two distinct points: (1) that Milton's various statements about the events at 543 Orchard Street could have influenced the course of the jury's deliberations, and (2) that additional evidence about the assault of Milton, in particular, could have caused the jury to consider those statements in a different light.

In the present case, the state adduced testimony from two particular witnesses who were present at the scene of the shooting itself. The first of those witnesses, Lachell Hall, testified that she saw a car pull into the drive-through lane of a Burger King shortly before the shooting. She saw her nephew, Pickette, seated in the front passenger seat, wearing a black shirt.[3] Hall testified that there were two other people in the car, one seated behind the victim wearing a "[d]arker shirt" that "could've been . . . black," and another behind Pickette wearing a red shirt, but she apparently did not recognize either of them.

Hall testified that she greeted Pickette through a partially opened window as the victim's car was pulling up to the drive-through and that Pickette responded, "hey, Chell . . . ." After the car came to a stop next to the menu board, Hall saw the victim get out of the driver's seat and walk around the car, behind the trunk. Hall testified that the victim then opened a door on the passenger side of the car and bent over to reach inside for something. She was walking toward the car at the time and was only about twenty feet away when "somebody got out [of] the back seat, [who] was behind [the victim], and shot him . . . ." According to Hall, both Pickette and the person wearing the red shirt were still seated on the passenger side of the car when those shots were fired. Although Hall testified on cross-examination that she did not see the gun or exactly where the shots had come from, she stated that the person she had identified as the rear driver's side occupant had walked around to the rear of the car and was standing with his

back to her at the moment of the shooting.

Hall's testimony about the initial positions of these individuals in the car was corroborated by video surveillance footage from a security camera located outside of a nearby CVS. Footage from that camera before the shooting shows (1) the victim's car pulling into the CVS parking lot and the victim exiting the driver's seat and walking into the CVS, (2) a person in a red shirt and shorts getting into the rear passenger side seat, (3) a person in a darker colored shirt, white shoes, and long pants getting into the rear driver's side seat, (4) a person wearing a black shirt with a white logo and shorts getting into the front passenger seat, and (5) shortly thereafter, the victim getting back into the driver's seat and the victim's car pulling out of the parking lot. Minutes after the shooting, video surveillance footage from that same store showed the person in the black shirt with the white logo and shorts crossing Orchard Street, running through the parking lot, and then walking west along Whalley Avenue. Because there is no dispute that the person running through the parking lot in this video recording was Pickette,[4] the jury could have easily inferred that Hall had correctly identified him as the occupant in the front passenger seat of the victim's car.

A second eyewitness, Jones, was walking from a grocery store located on the other side of Whalley Avenue to the Burger King with five of her children. As they were about to cross the street, Jones saw "some guys" standing around a car parked at the Burger King drive-through. Jones indicated that one of those people was wearing a red shirt and khakis and that another was wearing a "Canadian blue" shirt and jeans. Jones expressly testified that the person wearing the blue shirt "pulled out his gun and started shooting." Specifically, Jones told the jury that the shooter "was around the back of the vehicle, more near the passenger side," that she witnessed the shooter extending his arm to fire, and that she heard approximately five shots. Jones further testified that Pickette, whom she knew and recognized, was not the shooter.

Although the accounts provided by Hall and Jones differed in some respects, the description of the appearance and movements of the shooter that they provided to the jury both clearly implicated the defendant. Hall's testimony that the shooter had been seated directly behind the victim, in conjunction with video surveillance footage from the CVS parking lot, tends to exculpate the two people who were seated on the passenger side of the car. Although Hall testified that the shooter's shirt "could've been . . . black," she also testified that Pickette, the only other person who was wearing a black shirt that day, was not the shooter. Likewise, Jones' testimony that the shooter was wearing a "Canadian blue" shirt and long pants was sufficiently specific

to exclude the other potential suspects inside of the car.[5] Video surveillance footage from a Subway restaurant moments after the shooting clearly shows the three men who had previously entered the victim's car in the CVS parking lot running away from the scene of the shooting in the following order: first, a man wearing a black shirt and shorts, second, a man wearing a red shirt and shorts, and, third, a man wearing long pants and a shirt consistent with the "Canadian blue" description provided by Jones. A conclusion that the person standing near the trunk had shot the victim, who was reaching into the passenger side of the car at the time, is, likewise, consistent with the absence of stippling[6] and the presence of blood on the inside of the rear passenger door of the victim's vehicle. Finally, the observations of the shooter provided by both Hall and Jones were also consistent with the initial statements provided by Pickette and Lloyd to the police shortly after the murder, which were admitted into evidence at trial pursuant to *Whelan*.[7] Milton's observations on the day of the murder were, by contrast, related only to the events at 543 Orchard Street. Those observations, although relevant, are less probative with respect to the identity of the shooter than those from the eyewitnesses to the shooting itself.

The fact that Milton's initial statement to the police, which predated both Pickette's threats and the subsequent assault, failed to implicate Pickette provides another reason to conclude that any evidentiary error was harmless.[8] In order for the jury to have credited Milton's testimony in the present case that Pickette had brought the gun back to 543 Orchard Street, it would have had to conclude that Milton lied during her initial statement to the police when she said that it was the defendant who brought the gun back to the apartment after the shooting. Even if the defendant had been allowed to produce additional evidence to show that the assault of Milton had made her afraid to implicate Pickette at the first trial, that same fear would not have explained why, in her previous statement to the police, she chose to implicate the defendant, her own cousin, and not Pickette, a person she had not previously known.

In summary, we conclude that the defendant has not satisfied his burden of proving that the trial court's evidentiary error substantially swayed the jury's verdict. In our view, the accounts of the shooting from Hall, Jones, Lloyd, and Pickette, the video surveillance footage from security cameras in the surrounding area corroborating those accounts, and Milton's statement to the police, which implicated the defendant and predated both Pickette's threats and the subsequent assault, considered together, make it unlikely that additional evidence about the specifics of the assault would have caused the jury to have reached a different result. For these reasons, the defendant's claim of evidentiary error

must also fail.

## II

The defendant's second claim is that the trial court violated both his sixth amendment right to confrontation and our rules of evidence by preventing him from impeaching Jones with evidence of certain prior criminal convictions. We disagree.

The following additional facts and procedural history are relevant to our resolution of this claim. As explained in part I B of this opinion, Jones was an eyewitness to the victim's murder. At trial, defense counsel sought to impeach Jones with her prior criminal history, which consisted of a felony assault conviction in 1997, and three misdemeanor larceny convictions in 2002. In particular, defense counsel claimed that the facts underlying Jones' 2002 larceny convictions were relevant to her character for truth and veracity. The prosecutor responded that "the underlying facts would certainly be collateral" and were "well beyond" the ten year limitation on the admissibility of prior criminal convictions. The trial court granted the state's motion to exclude Jones' criminal history on the ground "that these three matters are too remote in time. A felony conviction from 1997 is twenty-two years old, [and the convictions for] issuing a bad check [in] 2002, [are] seventeen years old. They're too remote in time, so I will not allow inquiries on that." See Conn. Code. § Evid. 6-7 (providing that witness may be impeached by "[a] crime . . . punishable by imprisonment for more than one year" and that "the court shall consider," among other things, "the remoteness in time of the conviction").

On appeal, the defendant renews his claim that the exclusion of Jones' 2002 misdemeanor larceny convictions was improper because these convictions were relevant to Jones' character for truth and veracity. The defendant further argues that he was deprived of his sixth amendment right to confront Jones because "[h]e was foreclosed from exposing the jury to facts from which it could have appropriately drawn inferences relating to the reliability of Jones' eyewitness account." The state does not dispute that the evidence was relevant to impeach Jones' credibility but, instead, argues that "[t]he trial court properly excluded [it] on the grounds of remoteness." We agree with the state.

We begin our analysis with the admissibility of the challenged evidence under the Connecticut Code of Evidence. See, e.g., *State* v. *Annulli*, 309 Conn. 482, 491, 71 A.3d 530 (2013). Sections 4-4 and 6-6 of the Connecticut Code of Evidence govern whether witnesses may be asked about specific conduct in order to impeach their character for truthfulness. "These rules [prevent] the use of a general trait of character or propensity to prove that a person acted that way on a specific occasion . . . but make an exception for evi-

dence of a witness' character for untruthfulness. Subdivision (3) [of § 4-4 (a)] authorizes the court to admit evidence of a witness' character for untruthfulness or truthfulness to attack or support that witness' credibility. . . . Section 6-6 addresses the admissibility of such evidence and the appropriate methods of proof. . . . Specifically, § 6-6 (b) (1) permits the questioning of a witness about instances of the witness' conduct if the conduct is probative of the witness' veracity. Conn. Code Evid. § 6-6 (b) (1) ([a] witness may be asked, in good faith, about specific instances of conduct of the witness, if probative of the witness' character for untruthfulness).

"[T]he right to cross-examine a witness pertaining to specific acts of misconduct is limited in three distinct ways. . . . First, cross-examination may only extend to specific acts of misconduct other than a felony conviction if those acts bear a special significance [on] the issue of veracity. . . . Second, [w]hether to permit cross-examination as to particular acts of misconduct . . . lies largely within the discretion of the trial court. . . . Third, extrinsic evidence of such acts is inadmissible." (Citations omitted; internal quotation marks omitted.) *State* v. *Rivera*, 335 Conn. 720, 730, 240 A.3d 1039 (2020). Under the second limitation, which is the proviso at issue in the present case, even if specific acts of misconduct are indicative of a witness' lack of truthfulness and veracity, "[i]t does not follow . . . that . . . the court must permit the cross-examination. . . . In considering whether the court abused its discretion in this regard, the question is not whether any one of us, had we been sitting as the trial judge, would have exercised our discretion differently. . . . Rather, our inquiry is limited to whether the trial court's ruling was arbitrary or unreasonable." (Citation omitted; internal quotation marks omitted.) Id., 731; see also *State* v. *Martin*, 201 Conn. 74, 88, 513 A.2d 116 (1986) (trial court has discretionary authority to disallow cross-examination on specific acts of misconduct if it determines that prejudicial effect of evidence outweighs its probative value). "We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Internal quotation marks omitted.) *State* v. *Cecil J.*, 291 Conn. 813, 818, 970 A.2d 710 (2009).

We conclude that the trial court did not abuse its discretion in excluding the 2002 misdemeanor larceny convictions as too remote. The more remote a witness' specific acts of misconduct, the less probative they are of the witness' current character for truth and veracity. Indeed, we previously have observed that remoteness alone, apart from any other consideration, may justify, although not require, the exclusion of specific acts of misconduct. *Vogel* v. *Sylvester*, 148 Conn. 666, 676, 174 A.2d 122 (1961); see also, e.g., *State* v. *James*, 211 Conn. 555, 571–72, 560 A.2d 426 (1989) ("[e]ven if the evidence did involve untruthfulness, the court was well within

its discretion in excluding it because of its remoteness in time, its minimal bearing on credibility, and its tendency to inject a collateral issue into the trial"); *State* v. *Morgan*, 70 Conn. App. 255, 274, 797 A.2d 616 ("[a]lthough inquiry into . . . [specific] acts [of misconduct] might have borne on the issue of [the witness'] credibility, the court was free to determine, as it did, that the remoteness of the acts tended to outweigh their probative value"), cert. denied, 261 Conn. 919, 806 A.2d 1056 (2002); E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 6.28.4, p. 390 ("even if the conduct does relate to veracity, the court still has discretion to exclude it if the evidence has slight relevance due to remoteness in time or other considerations"). The misconduct underlying Jones' 2002 misdemeanor larceny convictions was at least seventeen years old at the time of trial, and, under these circumstances, the trial court was permitted, but not required, to find that its remoteness outweighed its probative value. We therefore reject the defendant's claim that the trial court abused its discretion in excluding the challenged evidence.[9]

The judgment is affirmed.

In this opinion ROBINSON, C. J., and MULLINS and KELLER, Js., concurred.

* This case originally was scheduled to be argued before a panel of this court consisting of Chief Justice Robinson and Justices McDonald, D'Auria, Kahn, and Ecker. Thereafter, Justices Mullins and Keller were added to the panel and have read the briefs and appendices, and listened to a recording of the oral argument prior to participating in this decision.

[1] The trial court sentenced the defendant to fifty years of incarceration for the crime of murder and a concurrent sentence of five years of incarceration for the crime of carrying a pistol without a permit, for a total effective sentence of fifty years of incarceration.

[2] As a result, we forgo any analysis of questions, such as relevancy, relating to the predicate question of admissibility. See Conn. Code Evid. § 4-1. We likewise note that, in the present appeal, the defendant has raised no claims with respect to either the sufficiency of the state's evidence or the third-party culpability instruction provided to the jury.

[3] Hall testified that she referred to Pickette as her nephew because her brother had children with Pickette's mother.

[4] The defendant and Lloyd, who was wearing a red shirt, were arrested at 543 Orchard Street shortly after the shooting. At trial, Pickette also identified himself as the person running through the CVS parking lot on the video recording.

[5] Pickette was wearing a black shirt, and Lloyd was wearing a red shirt. Both of those two men were wearing shorts.

[6] At trial, Susan Williams, a physician employed by the Office of the Chief Medical Examiner, testified that she conducted the victim's autopsy and had observed no stippling during the course of her examination. Williams stated that this observation tended to indicate that the barrel of the gun was more than two feet away from the victim at the time of the shooting.

[7] Indeed, it is a rare case in which the jury is provided with direct testimony from a witness who is able to give a comprehensive, detailed account of all of the events surrounding a murder. More commonly, evidence is derived from a variety of sources, such as in-court testimony and *Whelan* statements, that are not perfectly consistent in all respects. The fact that the state's case required a comparison of multiple statements does not, however, compel the conclusion that the evidence against the defendant was weak.

[8] By referring to Milton as a "snitch" and telling her to mind her own business, it is just as plausible that Pickette was trying to prevent Milton from implicating the defendant. Indeed, it was only *after* the assault that Milton began denying that she had seen the defendant with the gun on the

day of the shooting. This understanding is consistent with (1) the fact that both Pickette and Lloyd initially declined to identify the defendant as the shooter at his first trial; see *State* v. *Torres*, supra, 175 Conn. App. 152; (2) Pickette's and Lloyd's inability to recall particular details of the shooting in the present trial and the subsequent admission of their initial statements to the police, which implicated the defendant, pursuant to *Whelan*, and (3) Milton's testimony during the offer of proof in the present case that she viewed herself as being in "the same predicament" as Pickette, namely, being called to testify against the defendant.

[9] The defendant also claims that he is entitled to a new trial because of prosecutorial impropriety. Specifically, the defendant claims that he was deprived of a fair trial because the prosecutor made the following three statements in his rebuttal summation: (1) "[t]he shooter was seen on multiple occasions by multiple witnesses behind the driver's seat of this vehicle," (2) "[t]he shooter happened to be wearing a blue shirt and grey sweatpants that night," and (3) "[b]lue shirt, how they ran after-the-fact, arm extended; all of those are consistent  . . . ."

None of these arguments rises to the level of prosecutorial impropriety. The first argument is adequately supported by Hall's testimony that "somebody got out the back seat that was behind [the victim] and shot him" and the initial statements given by Pickette and Lloyd to the police. The factual assertions in the second argument, likewise, can reasonably be inferred from Milton's description of the defendant's attire on that day, Jones' testimony that the shooter was wearing a blue shirt and long pants, and the undisputed fact that both Pickette and Lloyd were wearing shorts. Finally, although the defendant correctly notes that the third argument failed to expressly distinguish between Jones' testimony that the shooter's shirt was "Canadian blue" and Hall's testimony that the shooter's shirt was "[d]arker" and "could've been  . . .  black," the prosecutor had already expressly acknowledged that distinction in his initial summation, stating: "Now, granted, [Hall] tells the police that night that she thinks the shooter or the person that got out of the back driver's side is wearing a darker shirt or a black shirt, she's not exactly sure. She certainly wasn't expecting to see a shooting. It's understandable that she might mess up a few details, but she testifies that it was a dark colored shirt. Blue is a darker color."

Moreover, even if we were to agree that the prosecutor's arguments were imprecisely worded, none of the challenged statements drew an objection from defense counsel or was repeated. See *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). The jury was also clearly instructed that representations made by counsel during closing summations were not to be considered as evidence and that it was the jury's recollection of the facts—not those of the attorneys—that controlled. As a result, we conclude that the defendant has failed to meet his burden of demonstrating that the alleged improprieties so infected the trial with unfairness as to deprive him of his constitutional right to a fair trial. See, e.g., *State* v. *Luster*, 279 Conn. 414, 442, 902 A.2d 636 (2006).

———————————————————